# EXHIBIT 1

Deposition of Chris E. Carhart - November 25, 2013                              1

```
 1            IN THE CIRCUIT COURT OF MILWAUKEE COUNTY

 2                        STATE OF WISCONSIN
   ------------------------------------------------------
 3
   CARHART-HALASKA INTERNATIONAL,
 4 LLC and HALASKA INTERNATIONAL, INC.,

 5              Plaintiffs,

 6 CARHART, INC., and CHRIS E. CARHART,

 7              Defendants and
                Third-Party Plaintiffs,
 8
                vs.                    Case No. 12-CV-000613
 9
   CHRISTOPHER G. HALASKA,
10
                Third-Party Defendant.
11
   ------------------------------------------------------
12

13


14          Deposition of CHRIS E. CARHART

15          Monday, November 25th, 2013

16
                        9:11 a.m.
17
                           at
18
                 HINSHAW & CULBERTSON LLP
19       100 East Wisconsin Avenue, Suite 2600
                   Milwaukee, Wisconsin
20

21

22

23

24

25       Reported by Loretta L. Stoeckmann, RPR
```

WWW.GRAMANNREPORTING.COM · 414.272.7878
Innovation · Expertise · Integrity
GRAMANN REPORTING

Carhart-Halaska International, LLC. et al vs.
Carhart, Inc. et al

Deposition of Chris E. Carhart
November 25, 2013

---

**Deposition of CHRIS E. CARHART, 11/25/13**  Page 2

1  Deposition of CHRIS E. CARHART, a witness
2  in the above-entitled action, taken at the instance of
3  the Plaintiffs and Third-Party Defendant, pursuant to
4  Chapter 804 of the Wisconsin Statutes, pursuant to
5  Notice, before Loretta L. Stoeckmann, RPR and Notary
6  Public in and for the State of Wisconsin, at HINSHAW &
7  CULBERTSON LLP, 100 East Wisconsin Avenue, Suite 2600,
8  Milwaukee, Wisconsin, on the 25th day of November,
9  2013, commencing at 9:11 a.m. and concluding at
10 4:59 p.m.
11 A P P E A R A N C E S:
12             CADE LAW, LLC, by
                 Mr. Nathaniel Cade, Jr.
13               P.O. Box 170887
                 Milwaukee, Wisconsin 53217
14               Appeared on behalf of the Plaintiffs and
                 Third-Party Defendants.
15
               HINSHAW & CULBERTSON LLP, by
16               Mr. Tomislav Z. Kuzmanovic
                 100 East Wisconsin Avenue, Suite 2600
17               Milwaukee, Wisconsin 53202
                 Appeared on behalf of the Defendants and
18               Third-Party Plaintiffs.
19             ALSO PRESENT:  Mr. Sheldon Bankier.
20                     I N D E X
21
   EXAMINATION BY                                   PAGE
22
   Mr. Cade                                           5
23
24            (Confidential portion of transcript is
   contained in separate transcript from page 143,
25 line 6 to page 143, line 17.)

---

**Deposition of CHRIS E. CARHART, 11/25/13**  Page 3

1                     E X H I B I T S
2  NUMBER                                   PAGE IDENTIFIED
3  No. 1   Operating agreement of                    20
            Carhart-Halaska International, LLC
4  No. 2   Withdrawn                                 49
   No. 3   10/25/12 Letter from Mr. Carhart to       66
5           Mr. Halaska
   No. 4   Second amended answer                     74
6  No. 5   Corporation file detail report            92
   No. 6   Defendants and Third-Party                94
7           Plaintiffs' Initial Disclosures
   No. 7   Beijing Kaihuai employee list            107
8  No. 8   Beijing Carhart employee list            115
   No. 9   3/8/13 Letter from Mr. LaDien to         117
9           Mr. Schmidt
   No. 10  Defendants' Response to Plaintiffs'      121
10          First Request for Production of
            Documents
11 No. 11  Defendants' Response to Plaintiffs'      127
            First Request for Admissions
12 No. 12  Defendants/Third-Party Plaintiffs'       128
            Response to Plaintiffs' Third and
13          Third-Party Defendant's Second Requests
            for Production of Documents
14 No. 13  Parts list                               128
   No. 14  Defendants/Third-Party Plaintiffs'       179
15          Response to Plaintiffs and Third-Party
            Defendant's Second Set of Written
16          Interrogatories and Plaintiff's Fifth
            and Third-Party Defendant's Fourth
17          Requests for Production of Documents
   No. 15  Defendants' Responses to Plaintiffs'     194
18          First Set of Interrogatories and
            Requests to Produce Directed to Defendants
19 No. 16  Defendants/Third-Party Plaintiffs'       251
            Response to Plaintiffs' and Third-Party
20          Defendant's First Set of Written
            Interrogatories and Plaintiffs' Fourth
21          and Third-Party Defendant's Third Requests
            for Production of Documents
22 No. 17  8/14/12 Email from Mr. Carhart to        253
            Mr. Halaska
23
24          (Original exhibits attached to original
   transcript.  Copies of exhibits attached to
25 copies of transcripts.)

---

**Deposition of CHRIS E. CARHART, 11/25/13**  Page 4

1                    R E Q U E S T S
2
3  ITEM REQUESTED                                    PAGE
4  ERP software in native form                         73
   Years delinquent of company registration            94
5  Sales to American Hydraulics                       179
   Supporting documentation for expenses/receipts     182
6  Mrs. Carhart's emails off hard drive               193
   Documents regarding settlement/purchase of         242
7    MRO claim
   Carhart, Inc., bank records                        243
8

---

**Deposition of CHRIS E. CARHART, 11/25/13**  Page 5

1       TRANSCRIPT OF PROCEEDINGS
2       CHRIS E. CARHART, called as a witness
3  herein, having been first duly sworn on oath, was
4  examined and testified as follows:
5       EXAMINATION
6       BY MR. CADE:
7  Q.  Good morning, Mr. Carhart.
8  A.  Morning.
9  Q.  For the record, could you please state and spell
10 your name?
11 A.  Chris E. Carhart, C-A-R-H-A-R-T.
12 Q.  And what is your home address?
13 A.  621 Seaview Court, Unit P-2, Marco Island,
14 Florida.
15 Q.  And you previously lived in Illinois?
16 A.  Yes, I did.
17 Q.  When did you sell that house, or do you still own
18 that property?
19 A.  We still own that property, but I changed
20 residency, I believe, in 2011.
21 Q.  2011, okay.  You've been deposed before, correct?
22 A.  Yes, I have.
23 Q.  How many times, sir?
24 A.  I believe four or five times.
25 Q.  Okay.  In relation -- I know there was one in

---

Carhart-Halaska International, LLC. et al vs.
Carhart, Inc. et al

Deposition of Chris E. Carhart
November 25, 2013

---

**Deposition of CHRIS E. CARHART, 11/25/13 — Page 66**

1 agreements with their obligations to the Company."
2 Did I read that correct?
3 A. Yes.
4 Q. We could put Exhibit 1 aside for a moment.
5 (Exhibit No. 3 was marked for
6 identification.)
7 BY MR. CADE:
8 Q. I'm going to hand you what's been marked as
9 Exhibit No. 3, Mr. Carhart.
10 A. Yes.
11 Q. And take a moment and review that document.
12 A. Yes.
13 Q. This is a letter that purports to have been
14 drafted on or about October 25th of 2012 last
15 year, correct?
16 A. Yes.
17 Q. And your signature is at the bottom both as
18 president of Carhart Incorporated, as well as
19 personally?
20 A. Yes.
21 Q. And what I'm looking at in particular is the fifth
22 paragraph starting with "due to the inability."
23 "Due to the inability of Carhart-Halaska
24 International, LLC to continue to pay service fees
25 and software licensing fees to Carhart

---

**Deposition of CHRIS E. CARHART, 11/25/13 — Page 67**

1 Incorporated for use of servers, software and
2 services your personal access to the servers owned
3 by Carhart Incorporated, all software and email
4 through the Carhart Incorporated email services
5 has been terminated."
6 Did I read that correctly?
7 A. Yes.
8 Q. Where was -- are there -- back up. Is there any
9 document between Carhart-Halaska and Carhart,
10 Inc., that identifies what software licensing fees
11 would be paid, whether it's on a daily, weekly,
12 monthly, or yearly basis?
13 A. No.
14 Q. Or quarterly?
15 A. No.
16 Q. Okay. What were those fees, when it says due to
17 the inability to pay the fees; what were the fees?
18 A. Those were a prorated portion of the cost of
19 operating our servers and updating the software
20 that CHI or Carhart-Halaska was using, as well as
21 a prorated portion of email exchange servers that
22 Carhart-Halaska was using.
23 Q. Okay. Is there a document that identifies what
24 those software licensing fees are?
25 A. No.

---

**Deposition of CHRIS E. CARHART, 11/25/13 — Page 68**

1 Q. And there's no document that you as Carhart, Inc.,
2 sent to Carhart-Halaska, whether that's you as a
3 member of CHI or to Mr. Halaska as a member of
4 CHI, identifying what those licensing fees are,
5 correct?
6 A. No.
7 Q. There is no document between the entities
8 identifying what the service fees are, is there?
9 A. No.
10 Q. What are the service fees?
11 A. I would have to look back in the records to tell
12 you what we were prorating per month.
13 Q. No, no, but what does it constitute? We've got
14 software licensing fees --
15 A. Oh, what does it constitute?
16 Q. Let me finish, sir. You've got to continue to pay
17 service fees and software licensing fees. I asked
18 you specifically about the licensing fees. What
19 are the service fees?
20 A. The service fees were server maintenance and
21 monitoring. That's an ongoing IT service that's
22 provided to us by -- it's provided to Carhart
23 Incorporated by a subcontracting company.
24 Q. Okay. Was there ever an agreement between
25 Carhart-Halaska and Carhart, Inc., as to the

---

**Deposition of CHRIS E. CARHART, 11/25/13 — Page 69**

1 payment of those service fees?
2 A. It was a operational expense like any other
3 operational expense, including entertainment. It
4 was a monthly charge.
5 Q. I understand that, sir. My question was very
6 specific. Is there any agreement --
7 A. No.
8 Q. -- between Carhart-Halaska and Carhart, Inc., as
9 to what service fees would be paid?
10 A. No.
11 Q. Okay. When service fees were paid, did
12 Carhart-Halaska write a check to Carhart, Inc.?
13 A. Yes, it did.
14 Q. Did you sign those checks, or did Mr. Halaska sign
15 those checks? Who signed the checks from CHI to
16 Carhart, Inc.?
17 A. Typically it would have been myself or my
18 facsimile signature.
19 Q. Okay. And who would have had the ability to put
20 your facsimile signature on a check?
21 A. My wife.
22 Q. Kexin?
23 A. Kexin.
24 Q. Kexin, K-E-X-I-N? I'm only pronouncing it the way
25 Mr. Fiedler said it.

---

Case 18-00273  Doc 48-1  Filed 06/09/19  Entered 06/09/19 15:57:59  Desc Exhibit
Exhibit 1 - Chris Carhart deposition transcript  Page 5 of 5

Carhart-Halaska International, LLC. et al vs.
Carhart, Inc. et al

Deposition of Chris E. Carhart
November 25, 2013

---

**Deposition of CHRIS E. CARHART, 11/25/13** — Page 70

1 A. I know. It's a hard one.
2 Q. Okay. So either you or Kexin are the only two who
3 would have had the ability to put your facsimile
4 signature on a check, correct?
5 A. Yes.
6 Q. Prior to you either signing a check or Kexin using
7 your facsimile signature on a check, did you ever
8 clear with Mr. Halaska, I'm going to write a check
9 from Carhart-Halaska's bank account to pay
10 Carhart, Inc.'s service fees?
11 A. No.
12 Q. Did you ever ask Mr. Halaska or your wife that
13 prior to writing a check to Carhart, Inc., from
14 Carhart-Halaska's bank account we are going to pay
15 the software licensing fees owed to Carhart, Inc.?
16 A. No.
17 Q. Okay. Did you -- I would assume that every month
18 after you wrote those checks you would send what
19 the service fees and software licensing fees were
20 to the -- Mr. Wasserman, correct? You'd say
21 here's the amount we've paid for service fees or
22 software licensing fees?
23 A. Mr. Wasserman had online access to our server and
24 had a password for both the server and for the
25 accounting system, and he could have looked at any

---

**Deposition of CHRIS E. CARHART, 11/25/13** — Page 71

1 day or any minute to see what the expenses were in
2 the general ledger.
3 Q. Right. I understand that but that wasn't my
4 question. Did you ever inform Mr. Wasserman on a
5 monthly basis -- let me back up. When you wrote
6 these checks, you or your wife Kexin, for either
7 service fees and/or software licensing fees, was
8 that done on a monthly basis or some other basis?
9 A. It was expensed on a monthly basis.
10 Q. Okay. And at the time of that expense, did you
11 ever communicate to Mr. Wasserman we've written a
12 check to Carhart, Inc., from Carhart-Halaska's
13 bank account to pay service fees or software
14 licensing fees?
15 A. No, we did not.
16 Q. Okay. It would be a line entry somewhere on the
17 expenses that it's -- would it say service fees?
18 A. It would be a line entry in the general ledger.
19 Q. That says service fees?
20 A. It would say -- it would specify the account and
21 descriptive data would be there based on what was
22 previously entered in ERP.
23 Q. ERP stands for?
24 A. Enterprise Resource Planning, and it's basically
25 the overall software package that we used.

---

**Deposition of CHRIS E. CARHART, 11/25/13** — Page 72

1 Q. And who manufactures ERP?
2 A. This ERP system, to clarify?
3 Q. Yeah.
4 A. ERP systems are designed by many, many companies.
5 Our ERP system is Sage software.
6 Q. Sage software?
7 A. Yes.
8 Q. Okay. And I know there was a prior discovery
9 request, and I'll get to that in a moment about
10 ERP by Mr. LaDien, L-A-D-I-E-N, who was previously
11 counsel for Carhart-Halaska and Mr. Halaska
12 personally, referencing or requesting the ERP
13 software in its native form.
14    Do you have the ability to provide
15 the software, the ERP software in its native form
16 of all of the data from June of 2006 to at least
17 October of 2012?
18 A. Please explain the term "native form."
19 Q. Sure. Native form -- well, when you hit print,
20 when you're looking at a computer screen, whether
21 it's an email, Excel spreadsheet, Microsoft Word
22 document, whatever it is when you hit print, that
23 is just a snapshot in time. Do you understand
24 that concept?
25 A. Yes.

---

**Deposition of CHRIS E. CARHART, 11/25/13** — Page 73

1 Q. Native form is you actually take the underlying
2 data, and it's transferred over to some other
3 medium, be that a disk, a floppy, a flash,
4 transfer it over, but the data itself, the raw
5 data is transferred over, its native form.
6 A. I don't know if that's possible or not.
7 Q. Okay. Because I know there was a request. Where
8 are the servers located?
9 A. They are in Naperville, Illinois.
10 Q. Are they located in your house?
11 A. Yes.
12 Q. The White Eagle Drive?
13 A. Yes.
14 Q. Okay. You have access to those servers, correct?
15 A. Yes.
16 Q. Okay. I will do a follow up to your lawyer,
17 because I don't think that data has been provided.
18 I'll send you a letter.
19    MR. KUZMANOVIC: That's fine. If you
20 show me the discovery request with that that
21 wasn't responded to, I will look into that as
22 well.
23    MR. CADE: At some point I'll have --
24 leave that out, sir -- I'll have a letter from
25 LaDien to Wick Schmidt indicating it's never been